**NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

Celanese Corporation et al., Intervenors.

No. 125, Docket 74–1258.

United States Court of Appeals, Second Circuit.

Argued April 25, 1975.

Decided April 28, 1976.

---

10. Parties Joint Appendix ("App.") p. 1771.

11. App. 131.

12. App. 1771.

13. *Id.*

14. Resp. Br. p. 24.

Angus MacBeth, New York City (Natural Resources Defense Council, Inc., Richard M. Hall, New York City, of counsel), for petitioner.

Raymond W. Mushal, Jeff Zimmerman (Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, Martin Green, Attys., Dept. of Justice, Washington, D. C., Henry J. Bourguignon, Toledo, Ohio, on the brief, and G. William Frick, Associate Gen. Counsel for Water Environmental Protection Agency, Washington, D. C., of counsel), for respondent.

Robert C. Barnard, Washington, D. C. (Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., and New York City, of counsel, Douglas E. Kliever, Charles F. Lettow, Washington, D. C., on the brief), for intervenors.

Before MOORE, Circuit Judge, and BRYAN and DUFFY,* District Judges.

MOORE, Circuit Judge:

Natural Resources Defense Council, Inc. ("NRDC" or "Petitioner"), petitions this Court to review and set aside identical portions of related regulations[1] promulgated by the Environmental Protection Agency ("EPA") assertedly pursuant to the mandate of the Federal Water Pollution Control Act Amendments, 33 U.S.C. §§ 1251 et seq. ("Act").

The regulations, so-called "effluent limitation guidelines", define the maximum permissible effluent discharge of various existing point source categories.[2] We have

---

* Honorable Frederick van Pelt Bryan and Honorable Kevin T. Duffy, United States District Court Judges for the Southern District of New York, sitting by designation.

1. 40 C.F.R. §§ 411 (Cement Manufacturing); 412 (Feedlots); 422 (Phosphate Manufacturing); 424 (Ferroalloy Manufacturing); 426 (Glass Manufacturing); 427 (Asbestos Manufacturing); 428 (Rubber Manufacturing); 432 (Meat Products).

2. A "point source" is defined as

already sketched the role played by such regulations in the overall operation of the Act in our accompanying opinion *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620 (Apr. 28, 1976, Dkt. No. 74–1687) ("74–1687"). Briefly, maximum permissible levels prescribed by the regulations are incorporated by permit-granting agencies into the permits for individual point sources.[3] The individual point sources fulfill their obligations under the Act by complying with the conditions incorporated by the permit grantors into the permits.[4]

The challenged portion of the regulations authorizes the permit-grantor to except individual plants from the regulation's restrictions upon a showing that the discrete plant's relevant factors are "fundamentally different" from those which were considered by the EPA in the promulgation of the regulations themselves. The challenged portion reads as follows:

"In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit evidence to the Regional Administrator (or to the State, if the State has the authority to issue NPDES permits) that factors relating to the equipment or facil-

ities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different for that facility compared to those specified in the Development Document. If such fundamentally different factors are found to exist, the Regional Administrator or the State shall establish for the discharger effluent limitations in the NPDES permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitations must be approved by the Administrator of the Environmental Protection Agency. The Administrator may approve or disapprove such limitations, specify other limitations, or initiate proceedings to revise these regulations." *See, e. g.*, 39 Fed.Reg. 6583 (February 20, 1974).

NRDC asserts that this "variance" clause violates the "Congressional direction that the rulemaking process of determining subcategories of industry categories be the only method for dealing with the major variations among dischargers [of pollutants]."[5] While Respondent EPA agrees with Petitioner that subject matter jurisdiction is validly predicated on § 509 of the Act,[6] it asserts that the "variance" clause is valid.

The issues might have remained restricted to the propriety of the "variance" clause but for a motion to intervene by a group of chemical companies: Celanese Corporation,

---

"any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged."
33 U.S.C. § 1362(14).
Industrial plants probably comprise the majority of existing "point sources".

**3.** § 402, 33 U.S.C. § 1342. References in the contested regulations and the accompanying administrative record are usually made to the Act rather than the United States Code. For

convenience we will follow this practice in the text, and will footnote cross references to the Code when a section of the Act is first mentioned.

**4.** 33 U.S.C. § 1342(k).

**5.** Pet. Br. 32.

**6.** 33 U.S.C. § 1369.

Union Carbide Corporation, Monsanto Company, Dow Chemical Company, FMC Corporation, Olin Corporation, American Cyanamid Company, E. I. DuPont de Nemours & Company, Allied Chemical Corporation and Hercules Incorporated (hereinafter referred to collectively as "Intervenors"). The motion was granted by this Court. Intervenors challenge the jurisdiction of this Court to review, under § 509 of the Act, the regulations which they assert were issued by EPA exclusively pursuant to § 304(b).[7] As a corollary they question whether EPA is authorized to issue regulations under § 301[8] of the Act, whether proper notice had been given in compliance with the requirements of the Administrative Procedure Act,[9] and whether the regulations comply with the requirements of § 304(b). Finally, they contend that the "variance" clause is invalid.

Briefs were also filed by amici curiae Allegheny Power System, Inc. *et al.*, Chamber of Commerce of the United States of America ("Chamber of Commerce") and American Iron and Steel Institute, Inc. Amici Allegheny Power *et al.* echo Intervenors' construction of §§ 301 and 304 but hedge on the question of the "variance" clause's validity. Amicus Chamber of Commerce also echoes Intervenors' construction of the Act, but believes the variance clause is valid if construed liberally.

■ Before we can consider the validity of the "variance" clause, we must first determine whether Intervenors correctly argue that we lack subject matter jurisdiction. Intervenors' jurisdictional argument turns on § 509 of the Act. Under that section, review of the Administrator's action "in approving or promulgating any effluent limitation or other limitation under section 1311 [§ 301], 1312 [§ 302], or 1316 [§ 306]" and "in issuing or denying any permit under section 1342 [§ 402]" may be had "in the Circuit Court of Appeals of the United States for the Federal judicial district" in which the person seeking review

resides, provided the application is made within 90 days from the Administrator's approval, promulgation, issuance or denial. Intervenors contend that the regulations were promulgated exclusively under § 304 of the Act and that since § 509 does not authorize review of agency action under § 304, this Court lacks jurisdiction. This jurisdictional challenge and the arguments in support thereof are the same as those with which we dealt in our decision in 74–1687, which upheld jurisdiction in this Court. Our decision there is equally applicable to this case. Although the question is doubtful and the statute ambiguous, we hold that the challenged regulations may, in combination, be considered as § 301 effluent limitations and § 304 guidelines.

Our decision in 74–1687 also disposes of several arguments addressed by Intervenors to the merits. Thus, the regulations need not provide for the "ranges" envisioned by Intervenors, nor need they contain a more detailed enumeration of the factors that the Act required the EPA to consider in the promulgating process. However, 74–1687 does not dispose of the issue which lies at the heart of this review: whether the challenged "variance" clause is valid.

■ Intervenors maintain that the variance clause is not sufficiently flexible to compensate for the rigidity which results from the "single number" regulations promulgated by the EPA. They claim that § 301 effluent limitations are to be promulgated, or, in effect, are to be fixed by permit-grantors applying flexible § 304 guidelines, and that a variance is not an acceptable substitute therefor. We disagree. If effluent limitations were not supposed to be formulated as nationwide regulations, then arguably the "variance" clause would not remedy the error. But as we held in 74–1687, single number effluent limitation regulations do not contravene the legislative intent, and without this premise the Intervenors' argument collapses.

---

**7.** 33 U.S.C. § 1314.

**8.** 33 U.S.C. § 1311.

**9.** 5 U.S.C. § 553.

We also disagree with amicus Chamber of Commerce's acceptance of the variance clause. As do Intervenors, it maintains that § 304 factors are only to be considered by the permit-grantors who formulate § 301 effluent limitations during the permit-granting process. But, unlike Intervenors, it is willing to wink at the alleged violation of this procedure by the EPA in formulating the regulations *sub judice*, provided the "variance" clause remedies the defect. Thus, it is willing to accept the "variance" clause only if it is construed to encompass wholesale reconsideration at the permit-granting stage of all the factors that were assertedly considered initially by the EPA in formulating the regulations. Although the form may have changed somewhat, the argument is in substance the same as Intervenors'.

Other amicus briefs, in effect, repeat these arguments and do not warrant separate consideration. This leaves only the arguments of the original parties to the controversy, the Petitioner and Respondent. In essence, Petitioner's argument is that a "variance" clause which allows permit-grantors to exempt individual point sources from the applicable effluent limitations is an impermissible derogation from the Congressionally mandated goal of national uniformity. Congress, they say, intended, in promulgating the regulations, that the process of categorization and sub-categorization would constitute the exclusive method of accounting for point source differences. Once a category is defined, all plants falling within that category are to be treated uniformly: a permit-grantor will incorporate the same effluent limitation into the permit for every plant within the same category. Consequently, there is assertedly no room in the statutory scheme for a "variance" clause which permits deviation from the categorical norm on a plant-by-plant basis. The very availability of the variance procedure will encourage divergent practices and standards in the application of the general regulations, and will allow Balkanization of that regulatory norm. If, as is likely, plants comprising a point source sub-category are located in several different States, each State's permit-granting administrator might develop a different variation for a plant within that State even though all the plants were originally grouped by the EPA in the same sub-category. When a point source demonstrates [10] the unsuitability of a applicable regulation, then the only remedy which is consistent with the maintenance of uniformity is a re-opening of the rule-making process and the alteration of the pertinent regulation. Thus argues the Petitioner.

The EPA responds that the variance provision is compatible with the Congressional goal of uniformity. Congress intended uniform treatment only for plants which are similarly situated, and in formulating regulations which will apply to many thousand [11] individual plants, it is virtually certain that some distinguishing characteristics of individual plants were overlooked. Thus, to insure that distinct plants receive appropriate differential treatment, the "variance" clause was assertedly adopted as an administrative safety valve.

■ We agree with the EPA's justification. As the Fourth Circuit observed in upholding the identical clause, provisions for variances, modifications and exceptions are appropriate to the regulatory process. *E. I. DuPont de Nemours & Co. v. Train*, slip op. at 19–20 (4th Cir., Mar. 10, 1976). And as the Fourth Circuit also mentioned, such clauses in other environmental regulations have previously been approved. *Train, supra*, at 20, citing *Portland Cement Association v. Ruckelshaus*, 158 U.S.App.

---

10. We have indulged in personification to simplify explanation of our rationale.

11. Estimates of the number of point sources potentially subject to the regulations promulgated pursuant to the Act vary. The Fourth Circuit states that "there are some 28,000 industrial dischargers and 27,000 others. About 30,000 applications for permits were filed." *E. I. DuPont de Nemours & Co. v. Train* (4th Cir., March 10, 1976) slip op. at 7. NRDC in its amicus brief submitted in 74–1687 represents that approximately 75,000 point sources will apply for permits. Amicus Br. at 8.

D.C. 308, 486 F.2d 375, 399 (1973) *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615, 641 (1973).

In *Portland Cement Association, supra*, new source performance standards promulgated by EPA pursuant to the Clean Air Act were under review. In discussing a proposed revision of the regulation permitting variances, the court stated that the provision:

> [i]n some sense . . . imparts a construction of "reasonableness" to the standards as a whole and adopts a more flexible system of regulation than can be had by a system devoid of "give." As we noted in *International Harvester, supra*, a regulatory system which allows flexibility, and a lessening of firm proscriptions in a proper case, can lend strength to the system as a whole. "The limited safety valve permits a more rigorous adherence to an effective regulation."

158 U.S.App.D.C. 308, 486 F.2d 375, 399 (1973). That court's admonition is equally appropriate here.

In the context of the Federal Water Pollution Control Act Amendments the variance provision is peculiarly appropriate. The sheer number of point sources potentially subject to regulation and the rapidly approaching statutory deadlines required the EPA to restrict itself in the regulation promulgation process to a representative sampling of plants. It is entirely possible that the resulting regulations will prove ill-suited to some of the unsampled individual plants to which they will be applied in the permit process. Unless the variance clause is established, there is no guarantee that such a defect could be effectively remedied if it occurred. Review of the regulations pursuant to § 509 of the Act is not an acceptable substitute. Since the Act authorizes informal rulemaking, review of the regulations will tend to be narrowly confined. The Petitioner's recommendation that the rulemaking procedure be re-opened at the permit-granting stage is unnecessarily cumbersome.

In actual operation there may not be a vast difference between refining the subcategories to meet the individual conditions found in a few plants and dealing with these differences under the variance clause. Congress, in enacting this radically different approach to the elimination of pollution, had in mind the many differences in existing plants—witness the many factors listed for EPA consideration in § 304. Nor is the injection of flexibility into the regulatory system inconsistent with the initial establishment of classes and categories. Not all of the thousands of plants in operation can be expected to fit into prefabricated molds or templates. By specifying a permit procedure, Congress implicitly conferred on the permit-grantor the privilege of construing the broader regulations in light of the specific type of plant applying for the permit. Without variance flexibility, the program might well founder on the rocks of illegality.

It would be premature at this point to consider whether the variance clause will be interpreted with sufficient liberality to accommodate all legitimate demands for flexibility. Such questions should await the disclosure and development of concrete factual controversies involving a single point source and its permit.

We hold that the establishment of the variance clauses is a valid exercise of the EPA's rulemaking authority pursuant to § 501(a) [12] which authorizes the Administrator to promulgate regulations which are necessary and proper to implement the Act.

12. 33 U.S.C. § 1361.