**PORTER COUNTY CHAPTER OF the IZ-AAK WALTON LEAGUE OF AMERICA, INC., et al., Petitioners,**

v.

**Russell E. TRAIN, Administrator, United States Environmental Protection Agency, Respondent.**

No. 76–1342.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1976.

Decided Feb. 18, 1977.

Rehearing Denied March 28, 1977.

Edward W. Osann, Jr., Marvin N. Benn, Chicago, Ill., for petitioners.

Peter G. Veeder, Pittsburgh, Pa., John C. Berghoff, Jr., Chicago, Ill., for intervenor.

Peter R. Taft, Asst. Atty. Gen., Lloyd S. Guerci, Atty., Dept. of Justice, Washington, D. C., Ray McDevitt, Washington, D. C., for respondent.

Before MOORE, Senior Circuit Judge,* and PELL and SPRECHER, Circuit Judges.

MOORE, Senior Circuit Judge.

Petitioners, Porter County Chapter of the Izaak Walton League of America, Inc., Save The Dunes Council, Inc., Florence Broady, William Hankla and Herbert P. Read (individually and collectively referred to as the "Petitioners"), bring this petition to review a final order of the Administrator of the Environmental Protection Agency ("EPA") entered on January 7, 1976, which order dismissed Petitioners from the proceedings, hereinafter described, to which they had become parties.

Desirous of abating and ultimately ending pollution of our nation's waters, in 1972 Congress enacted the Federal Water Pollution Control Act Amendments, 33 U.S.C. § 1251 et seq. (Supp. V 1975) ("the Act").[1] Compliance with statutory requirements was to be obtained by the issuance of permits.[2] To obtain such a permit, most elaborate procedures were prescribed. 33 U.S.C. §§ 1341–42 (Supp. V 1975). Practically every detail which imaginative draftsmen could foresee was embodied in regulations governing the issuance of a permit, to assure that all who might be affected thereby had an opportunity to be heard. 40 CFR § 125.1 et seq. (1976). Permits were to be issued by the Administrator. The program was given the impressive title of National Pollutant Discharge Elimination System (and the quite unpronounceable acronym of "NPDES") and a permit, in theory at least, was issuable only after compliance with sections 301, 302, 306, 307, 308 and 403 of the Act. 33 U.S.C. § 1342(a) (Supp. V 1975). Against this formidable background of statute and regulation, what are the facts which bring this controversy before us?

I.

Midwest Division, National Steel Corporation ("Midwest") in the 1960's had constructed a steel mill in Porter County, Indiana, and as part of its manufacturing process poured pollutants into the waters of Burns Waterway Harbor, a tributary to Lake Michigan. A permit was required which would limit such pollutants so as to comply with the applicable statutes and regulations.

Obviously, the Administrator alone could not pass upon the thousands[3] of permit applications. He delegated this authority to the ten EPA Regional Administrators. 40 CFR § 125.5 (1976). The Regional Administrator of Region V in Chicago, with jurisdiction also over Indiana, in turn delegated permit-issuing authority to the Director of the Enforcement Division of Region V. Id.

In September, 1974, the Regional Office (Region V) (frequently referred to herein as "EPA") and the State of Indiana Stream Pollution Control Board ("Indiana") issued a notice that a tentative determination had been made, pursuant to § 402 of the Act, 33 U.S.C. § 1342 (Supp. V 1975), to issue a permit to Midwest subject to certain conditions. The facts relating to the proposed effluent limitations were made public, and were stated with some particularity in a fact sheet describing in detail the existing discharge and the proposed NPDES permit.

---

* Honorable Leonard P. Moore, United States Circuit Judge for the Second Circuit, sitting by designation.

1. Act of October 18, 1972, Pub.L. No. 92–500, 86 Stat. 816 et seq.

2. 33 U.S.C. § 1342 (Supp. V 1975) reads in part as follows:
"[T]he Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, . . . upon condition that such discharge will meet either all applicable requirements under sections 1311, 1312,

1316, 1317, 1318, and 1343 of this title, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter."

3. Estimates of how many plants could be involved in applying for NPDES permits have ranged from 30,000 to 75,000. Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 537 F.2d 642, 646 n. 11 (2d Cir. 1976).

After issuing the permit, EPA properly granted Midwest's request for an adjudicatory hearing thereon. Notice thereof was sent to Petitioners, who were advised that they might intervene.

The regulations governing adjudicatory hearings are most explicit. 40 CFR § 125.-36(a)–(o) (1976). There is no point in needlessly setting them forth, even in the margin. In substance, they provide for a Judicial Officer, here the Administrative Law Judge ("ALJ"), to whom the Administrator may delegate his authority with procedures and requirements to govern prehearing conferences, adjudicatory hearings, findings, and any administrative appeals.

The issue now before us is not related to the merits of the permit, but solely to the dismissal of Petitioners as parties to the proceeding. The chronology is important:

*January 8, 1975*

The ALJ notified the parties of record (Petitioners had not yet become parties), by letter, of a prehearing conference to be held on March 20, 1975, with the mandatory provisions of 40 CFR § 125.36(h) to be complied with on or before March 13, 1975.

*January 29, 1975*

Petitioners requested party status.

*February 6, 1975*

Petitioners attended a meeting concerning the Midwest permit with EPA, Indiana and Midwest.

*February 18, 1975*

Petitioners' request for party status was granted, and they were notified of the necessity to comply with 40 CFR § 125.36 and the ALJ's order of January 8, 1975.

*February 24, 1975*

Petitioners as intervenors were once again notified of the necessity of compliance with the ALJ's January 8, 1975 order.

*March 10, 1975*

Petitioners moved to extend their time for compliance with the ALJ's order.

*March 13, 1975*

EPA and Midwest timely filed statements pursuant to the ALJ's order of January 8, 1975.

*March 20, 1975*

The prehearing conference was held. Petitioners' time for compliance was extended to April 17, 1975. A draft stipulation, previously circulated, regarding remaining contested issues, was discussed. Midwest, Indiana and the Chicago Department of Water and Sewers indicated agreement with the stipulation, yet Petitioners sought still more time to consider it.

*March 24, 1975*

The ALJ ordered all parties to indicate their positions as to the stipulation by April 3, 1975. If not in agreement, such party was required to furnish a statement to the ALJ specifying its objections.

*March 31, 1975*

EPA advised the ALJ by letter of its agreement with the stipulation.

*May 20, 1975*

All parties except Petitioners had by now agreed to the stipulation. Petitioners had at no time presented specific objections to the stipulation, nor had they indicated that they would comply with the procedural orders of the ALJ.

*June 6, 1975*

Midwest moved to dismiss Petitioners for failure to comply with the ALJ's orders and the applicable regulations.

*June 10, 1975*

The ALJ asked for comments regarding the motion.

*July 9, 1975*

The ALJ granted the motion to dismiss Petitioners and certified the stipulation and a supplemental stipulation.

*July 29, 1975*

Petitioners filed a Petition to Invoke the Supervisory Authority of the Regional Administrator, Region V, to review the July 9 order of the ALJ.

*October 1, 1975*

The Regional Administrator denied Petitioners' petition to review the ALJ's July 9 order. Also, a modified NPDES permit was issued by Region V in accordance with the executed stipulations.

*October 31, 1975*

Petitioners filed a petition with the Administrator to review the Regional Administrator's decision.

*January 7, 1976*

The Administrator denied the October 31, 1975 petition.

Thereafter the Petitioners appealed from this order and sought thereby to reopen the adjudicatory proceeding and to reinstate Petitioners and the issues raised by them.[4]

### II.

■ The Izaak Walton League, as its name implies, is presumably interested, on a *pro bono publico* basis, in preserving the waters of Lake Michigan in such an uncontaminated condition as will permit the piscatorial life therein to lead reasonably healthy and happy lives and, if by chance a denizen of the deep were to be brought to the table by a member of the League or the public, to be safely edible. Midwest, on the other hand, is interested in the manufacture of steel—possibly including steel for fishing rods—and found this tributary of Lake Michigan a most convenient dumping place for such refuse as was produced in the process.

The recent public consciousness of the pollution problem has brought about the legislation here involved. That there is conflict between the ecologists and the industrialists is not surprising. The nation cannot continue the pollution of its waters. Nor can it shut down all its steel plants. The Act and the regulations thereunder are Congress' best effort to balance these often conflicting interests. The permit procedure prescribed is designed to accommodate these interests within the range of the best presently known technology.

Congress also wished to extend participation in public hearings as broadly as possible.[5] Accordingly, Petitioners have been admitted at their request as parties. But a *pro bono* status does not relieve them of the duty to comply with the procedural rules applicable to, and followed by, all other parties.

A detailed review of Petitioners' failure to comply with the many orders of the ALJ will not materially enhance this opinion. Suffice it to say that he was more than tolerant of their defaults, and when extensions of time were requested, he granted them. On the other hand, the record is replete with Petitioners' refusal to furnish precise statements of their position, of their objections to the proposed stipulation, or of their own proposals for effluent limitations.

Petitioners claim that they were handicapped by lack of funds, yet they attended and participated in the conferences and hearings. They stress that they were unable to comply because their demands for information *in writing* were not met. However, the regulations do not provide for, or require, *written* replies to oral or written requests put forward by any party to the proceedings.

---

4. Thus, Petitioners have gone from the ALJ to the Regional Administrator to the Administrator and now to the Court of Appeals, at each step having their contentions ruled upon anew. All of these appeals have been furthered by Petitioners according to law, but even in the law there must be some point of finality. Possibly that point has now been reached.

5. 33 U.S.C. § 1251(e) (Supp. V 1975) reads in part as follows:

"Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. . . . ."

Where avoidance of pollution is of the utmost importance, expedition of the hearings with respect thereto is equally so. The ALJ did everything in his power to attain this objective. He sought to clarify the issues, to eliminate unimportant ones, and to arrive at an ultimate result satisfactory to all. Witness the stipulations agreed to by equally (if not more so) interested parties, EPA, Indiana, the City of Chicago and Midwest. He could not delay the proceedings forever merely because of Petitioners' failure to state precisely their objections. Under the circumstances, he quite properly dismissed Petitioners in accordance with all applicable dictates of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.,* and the relevant EPA regulations, 40 CFR § 125.36. Furthermore, there is no reason to believe that the permit issued upon the stipulation of the four parties above mentioned did not fully comply with the requirements of the Act.

Nor is denial of review by the Administrator tantamount to a refusal to review the record. His very decision belies this concept. After a recitation of the relevant chronological events, the Administrator carefully reviewed the factual issues which Petitioners raise here. He concluded that the ALJ had been in the best position to make an impartial assessment as to whether or not Petitioners had reasonably complied with his orders, and that there had been no clearly erroneous factual finding. Moreover, the Administrator analyzed Petitioners' claims that the ALJ violated applicable EPA regulations [6] by ruling himself on the "legal" issues in the proceeding rather than referring them at the outset to the Assistant Administrator for Enforcement and the General Counsel. We agree with the Administrator that Petitioners have shown no error here in this regard.

The petition for review is denied.

---

6. 40 CFR §§ 125.36(h)(4)(ii) and 125.36(m) (1976).